The next case today is Comcast of Maine, New Hampshire, Incorporated, et al. v. Janet T. Mills, et al. Appeal No. 20-1104. Attorney Taub, please proceed. Good morning again, Your Honors, and may it please the Court. With the Court's permission, I would like to reserve two minutes of rebuttal time. You may. Thank you. Your Honors, the First Amendment ensures that people and corporations have the freedom to speak however they see fit without restrictions imposed by the government. And so when a state does restrict the ability of a person to speak, the First Amendment is implicated. And then courts must decide at that point what the appropriate level of scrutiny is, whether it's going to be strict scrutiny, intermediate scrutiny, or the commercial speech test, and decide whether whatever the government imposed any restriction on the ability of either cable programmers or cable operators to speak. Programmers are free to create whatever content they like, and they're free to license it to cable operators. Counsel, as a baseline for me, and I think this might be helpful for all of us, I'm trying to understand how this law would actually work in practice. What does it actually require cable operators to do in order to offer subscribers the option of purchasing access to cable channels or programs individually? I ask that because you seem to have conceded in the District Court that one has to be a subscriber before they can invoke this law. And I understand a subscriber to be one who has agreed to purchase at least a basic package that a cable operator would offer. If that's true, what does the cable operator then have to do to meet the a la carte requirement of this statute? That's what I'm trying to understand. So, Your Honor, the way the law would work is that once a person becomes a subscriber by purchasing whatever sort of the basic level of cable is for that particular cable operator, then the customer would be allowed and the cable operator would be required to provide any additional content that the customer wants on an a la carte basis. So, if they get a basic package that just includes the very basic sort of networks and a few other channels, but they also want to get NESN or ESPN in addition, instead of having to buy maybe a $100 sports package or whatever the package is that includes that station, the cable operator would be required to give them just simply that individual station, that one channel, and charge whatever rate they feel is appropriate for that. If I could follow up on Judge Lopez's question. I thought it wasn't just subscribers who bought the basic package. You could have bought any package and you would have been required on your request, the cable company would then have been required to provide you with, say, the Red Sox or, and for that matter, perhaps not the entire season, but a single game. So, can you take those seriatim? Yeah, so I was just using subscribing to the basic package as an example, but... The law is not so limited, I believe. Well, I think the law is clear that you have to be a subscriber. Well, yes, but there are subscribers to all I don't know if I have exactly the intent of your question, but however the person becomes a subscriber, and so whatever package of programming that that person is subscribing to, anything that's not included with that then has to be provided on an a la carte basis. Okay, and then my second question amounted to what an a la carte basis meant. Does it mean, well, you then have to be able to subscribe to whatever the Red Sox channel is, but only to the Red Sox and then only for the entire season or on a game by game basis? So yeah, that's an excellent question, Your Honor, and obviously this statute obviously has not been implemented yet, and so we don't have the benefit of any interpretations, but that said, the way that we interpret it now is that yes, if someone wanted to simply get a single Red Sox game, then the cable provider would be required to provide that. That's the way I read it. I appreciate your candor. Thank you. I believe I interrupted Judge Lopez, who may have further questions for you. No, that's fine. I appreciate the further clarification, but so as you describe what the cable operator has to do, they have to make the kind of programming decisions they never had to make before. Why doesn't that, their need to comply with the law as you've now described it, why doesn't, I mean, those are programming decisions they have to make that seem to implicate editorial discretion in this way, that they'll be deciding what they may have to add, what they may have to delete from the offerings that they make to their customers. So just as you described the changes they have to make in the way they offer their content, it sounds like a form of editorial discretion. Why is that not the case? So the reason that's not the case, and so let me just start with the Turner decision, which really is the principle case the cable operators are relying upon. And that case only stands for the proposition that there's this editorial discretion for cable companies to decide what content they are going to offer to consumers. So the problem in Turner was that the federal government was dictating the content that cable operators had to provide. So when the court talks about editorial discretion, it's talking about what channels and programs an operator will carry or won't carry. Now what the main law does is it doesn't get in the way of that decision. It doesn't get in the way of the decision about what channels or programs a cable operator wants to offer. It only kicks into place once the operator makes a decision, it's a discretionary decision to provide certain content, and then at that point the law kicks in and says, you know, you're still free to offer this in packages, you can still create your family programming tier, your comedy tier, your sports tier, you can create whatever tiers or packages you want, but you also have to give customers the option of buying it individually. And I think, you know, if you go back and if you look at the declarations that were submitted in this case, there was a declaration from Nesson and there was a declaration from Comcast. If you look at those really closely, it's clear that there's no message being conveyed. They're not attempting to convey some kind of message in how they sell their channels. Yes, counsel, if I may interrupt. The district court opinion fines against this editorial discretion by saying there was no direct interference with expression. But, like Judge Lopez, I have some questions about that. Among the three or four arguments that both the cable operators and the programmers, and by the way, I don't think the district court opinion adequately dealt with the programmers' arguments, is the argument that, look, by bundling into packages, we are supporting small programs, which we think should get some viewership, but the only way we can make them commercially viable is by bundling them with more popular programs. That strikes me as going not only to editorial discretion, but directly to the First Amendment interest in expanding expression, and that is a choice that the cable operators are now making, which this statute would essentially prevent them from making. So, Your Honor, I think I have at least two responses to that question. There's about four minutes left. The first response is that is an argument that they're making in their briefs, but if you go back and you look at the declarations, there's nothing in there, nothing in the declarations about the importance of having packages to support... Sorry, I have read those, and my back and reread them. I thought that point is directly made in the declarations. Well, if it is, I apologize, Your Honor, but my reading of the declarations is that this is about how to attract the greatest number of customers and maximize the revenue, but I think the second to a niche programmer, and I think the other point is that at this point in the affidavits, in the declarations, there's no evidence suggesting that that is going to be what the effect is. So, Your Honor, if you're correct, and I assume you are, that there is some reference in the declaration to the need to sort of promote niche programming, there's nothing to suggest that this is going to interfere with that because they are still allowed to offer these packages. We're not saying you can't offer these packages anymore. And so, I guess my best response is... But why would people buy the packages if they can get them on a, you know, when I want to see them a la carte basis? Yeah, so I think what I would say to that is there's nothing in the law that restricts the amount that companies can charge for the a la carte programs. So, I would suspect, and they put this in, this is something that they do put in their declarations, that if they offered Nesson individually, it's going to cost more than part of the package. And can I ask, at some point I would like to ask a question, so finish. Yeah, so they can charge whatever appropriate amount that they want. And so, to the extent that they do lose any revenue because some customers are going to want to buy certain stations a la carte, they are free with their pricing model to either make up for that revenue or to really encourage people to buy the packages. Because the cost of buying one station is going to be a worse deal than buying the whole package. Okay, my question is, we're dealing here with intermediate scrutiny, are we not? Well, so we would say no. We would say that the First Amendment is not even implicated in this case at all. If it were, we would be dealing with intermediate scrutiny, wouldn't we? Well, so yes, that's our argument. I think that the cable companies will tell you that it's strict scrutiny. All right, well, what is the substantial governmental interest involved in this law? So, the substantial governmental interest is ensuring that customers have access to cable television. And so, there's evidence in the record that for some people, the cost of the package is prohibitive for them. So, if there's a particular channel that they want or particular programs they want to watch, they simply can't afford to get that content. And so, that's the interest that the state is advancing is broader access to cable television. Consumer protection, would you say? Yes, absolutely, Your Honor. And just before I lose sight of this or my time runs out, Judge Lynch, just to go back to your point, to the extent that the court, we don't think that there's, from a First Amendment standpoint or from a preemption standpoint, we don't think there's any material distinction between being required to offer channels individually as opposed to programs individually. But to the extent that the court thinks that there's a problem with offering individual programs, but there's not that problem with channels, I think it's fair for the court to sever out from the statute the reference to the programs. Except the district court did issue the preliminary injunction based on a finding that the law selectively applies to one participant in the particular market, the direct cable companies, and not its direct competitors. And that under a combination of Supreme Court cases, including most recently the IMF health care case, you simply can't do that because it is too easy for government, pardon my basic First Amendment theory, but it's too easy for government to put a thumb on the scale when it doesn't like a particular speaker and make them non-competitive in their particular marketplace. That is what I understand to have been the underpinnings of this branch of First Amendment theory. There's no severance available under this statute that solves that problem. Do we agree on that? I know you don't think it's a problem, but assume it's a problem. If it's a problem, do you agree there's no severance available? So yes, and then but your honor, can I continue with the but? The district court misinterpreted in our time, may I continue? Yes, you may. Thank you. So our view is the district court misinterpreted tax cases, where the Supreme Court has recognized that there's a long history of taxes being used to censor the press. And so the only cases that we're aware of, and the only cases that the apologies cite to, are cases where a group or a component of the media or the press was singled out for a tax. There is no other case in which a law was struck down merely because it applied just to some aspect of the press. And the other point that I want to make there, your honor, is that Maine already has a whole set of restrictions that apply only to cable operators. So cable operators and cable operators only have to, you know, have a toll-free number, they have to have an office during business hours. Counselor, you're not suggesting that those kind of consumer protection measures have anything to do with programming, the programming that is a cable operator. I mean, offering a toll-free number, I mean, how you handle cancellation of subscriber, those are so far removed from what we have here. I don't know how you can argue that if we were to adopt the singling out analysis of the district court, that that would threaten all those consumer protection measures. That seems like quite a reach, frankly. So respectfully, your honor, we disagree. So I think the problem is that the lines are getting blurred between sort of the two different arguments. The arguments about are we interfering with content and the argument that the First Amendment is implicated simply because we've singled out one particular category of First Amendment speakers. You know, these customer service obligations impose costs on cable operators, costs that other, you know, that satellite providers and online providers, they don't have to incur those The simple fact that a state has imposed burdens on one particular class of First Amendment speakers doesn't by itself mean the First Amendment is implicated. You have to go one step further, which is to see whether or not what the state is doing is somehow interfering with the ability of that speaker to get their message across. And so if you look at all the cases that they cite to, in every single case, the state had done something affirmative to make it more difficult for the counsel. If I could pursue Judge Lopez's line here. I don't see how this is a consumer protection thing. I don't think the fact that consumer protection statutes cost everybody a little bit of money has anything to do with this case. It would seem to me that a statute that allows the consumer to decide what he wants or she wants to hear involves consumer protection. I think it's the other side of the First Amendment. If I could continue with my question. What we were talking was the differential treatment among competitive entities. And as I understood it before the district court, you made no attempt to justify why cable providers were singled out in this law, but satellite TV was not and virtual content providers were not. Is that correct? I'd say it's mostly correct, Your Honor. I will say that what we said below is that the reason that this was applied to cable operators is it was cable operators that the state was getting complaints about. They weren't getting complaints about other kinds of providers. But otherwise, yes, Your Honor, I would agree with you. I just have a couple of quick questions. It's obviously a very important case. I'd like to just pursue another line if I could, please. Go ahead. Thank you. I understand the state's position to be that if the First Amendment applies and intermediate scrutiny is the test, you cannot prevail on this appeal. Do I understand your position correctly? Yes. The record would not support sort of the first piece of the intermediate scrutiny analysis that this law furthers an important substantial governmental interest, such as reducing the pricing of cable services. You acknowledge that, is that correct? We agree that if this court finds that this law does implicate the First Amendment, that we would lose this appeal and then the issue would be going back to the district court to decide whether or not we can create a record to justify the law. OK. And the district court acknowledged that issue and said, I'm not going to address it now. It's a difficult issue. I gather it is your position, it would be your position, that you would be allowed to supplement the record before the district court that was not made before the legislature in order to justify this law. Would that be your position? That is our position. It's a position that the other side disagrees with, but that is our position. Yes. OK. All right. That's just helpful for me to know. All right. Thank you. Thank you. I have one further question pursuing that same topic. This court doesn't need to address that question. This court only needs to address whether there was an abuse of discretion in the district court issuing the preliminary injunction. Correct. And we would not be offering an opinion on as to what happens on remand or after the fact the state can come in and prove to a court that which its legislature never considered. Is that correct? Correct. That issue is not before the court. I guess the only thing I just want to clarify is that in terms of the abuse of discretion, I mean, our view is that the court has abused its discretion if it made an error of law, which this court reviews de novo. Yes. Thank you. That's very helpful. Thank you. Thank you. Well, if there are no further questions, I will turn my video off. Thank you. Thank you. At this time, attorney. Thank you very much, counsel. That concludes the argument in this case. Attorney Taub and Attorney Brill, you can disconnect from the meeting. I haven't. I apologize. I jumped ahead. I'm sorry. I apologize. Attorney Brill, please proceed. I apologize. Thank you, sir. May it please the court. Matthew Brill for the appellees. The state's arguments under both the First Amendment and preemption suffer from the same fundamental flaw. They take an extremely cramped view of the constitutional principles here and preemption by arguing, in essence, that only a mandate to carry particular programming, a channel of cable shows or individual programs would implicate the First Amendment. And that's simply not the case under the governing law. The law makes clear that the First Amendment and our editorial discretion are implicated not only when we're told what to carry, but how to carry that programming. That editorial judgment of how to create packages and tiers of to sell them all a cart is at the core of our business and the editorial discretion that cable operators and programmers make. When programmers license content, they often don't have the rights to disaggregate content. We put in our declaration from Nesson, for example, that the major sports leagues won't allow the distribution over cable without being part of the basic tier because they want to reach a wide audience. And as Judge Lynch recognized, that's a big part of promoting diversity of content and niche programming to use packages. So this is at the core of our business. And this is a law that aims at the heart of our editorial discretion. And even laws that incidentally affect cable have always been found to implicate at least intermediate scrutiny. But this is an easy case because this law is directed at our editorial judgment and discretion and aims to displace it. Do you agree that this is a consumer protection law? I don't, Judge Durway. I think this is a law that is aimed at governing the manner in which we present content to consumers. Well, isn't that in some way a consumer protection law, isn't it? Well, Your Honor, the statute specifically... What do you mean? It tries to prevent bundling. Am I correct or am I looking at this the wrong way? I do think it is ostensibly aimed at promoting consumer interests, but it does so in a way where there's no evidence... That wasn't my question. Is it aimed at preventing bundling? Yes, Your Honor. Isn't that a consumer protection aim? I think in that sense, most of the competition laws, the antitrust laws, the cable laws in Title VI of the Communications Act are aimed at promoting the interests of consumers. But when the statute speaks of consumer protection laws, it is generally talking about the types of consumer mandates that the FTC and state AGs enforce, generally applicable anti-fraud measures, customer service requirements. When Section 552 of the statute preserves consumer protection authority, it is referring to the more routine measures that govern when a cable operator's technician comes to your home... But I thought I just said consumer protection. I didn't go into those details. Well, in all events, to the extent it's labeled as such, it still undoubtedly implicates the First Amendment, Your Honor. Whether the First Amendment applies doesn't turn on whether you label this a competition law, a consumer protection law, or something else. IMF, health care, the Supreme Court's decision. They're the states in order to protect consumers of name brand pharmaceuticals from overpricing and discouraging them from buying generics. Prohibited the visits when doctors indicated they didn't want the visits from drug detailers. And the Supreme Court said, no, even if you have some form of mild consumer protection interest here, that is not sufficient to justify both the discrimination and the restriction on the commercial speech rights. I think IMF is actually quite relevant to this appeal. We certainly agree, Your Honor. The singling out, as the district court recognized, does put this squarely within the First Amendment. But even more basically, all of the Court of Appeals decisions and Supreme Court decisions that assess burdens on cable, all of them have held that the First Amendment is implicated when it goes to some speech interest. Let me give a few examples where the regulation impacted cable in a way that was far more a field from editorial discretion than this one. A good example is Los Angeles versus preferred communications, a case the Supreme Court decided before Turner was decided. And that case involved Los Angeles' decision to withhold a franchise from a cable operator. Even though the court said the interest there was really digging up city streets and attaching to utility poles, something that really doesn't directly implicate editorial discretion, the fact that that would prevent the provision of a cable service made it obvious to the court that the First Amendment was implicated. But here, the bundles, as I understand, the law doesn't tell you what to put in the bundles. It just allows the consumer, after the bundles are out, to determine which part of the bundles they want. So how does that affect editorial discretion in preparing the bundle? In two distinct ways. This notion that it applies only after we choose what to carry ignores how cable carriage negotiations work. There needs to be an agreement, and we've described these as affiliation agreements, between the programming network and the cable distributor. That agreement is contingent on the programmer assenting to the manner of distribution. For example, the declaration from Nesson points out they can't license Major League Baseball content without a prior agreement from the cable operator to distribute it on the basic tier. So there won't be an agreement. There is no notion that we agree to carry in only after there is some intrusion on our discretion. There won't be an opportunity to carry a lot of programming that is distributed in Maine today because programmers won't license it in that manner. But even more fundamentally, in all of the cases I was describing, like preferred communications and the D.C. Circuit's decisions on ownership limits, recognize that even if you view this as an incidental impact and not a direct impact, and we think it's quite direct, there too the First Amendment is implicated. So where we're in the business of making editorial judgments, and this law, as the Ninth Circuit put it in the SBCA case about satellite measures, seeks to influence the manner in which we exercise editorial discretion, that plainly implicates the First Amendment. You accumulate editorial discretion with economic purpose. Well, Your Honor, I don't think that there's a neat distinction between editorial choices and economic choices. They are bound up together. If we look at the business of newspapers, which are quite obviously protected by the First Amendment, they make choices that are both editorial in nature in terms of layout, but economic. As we pointed out in our brief, the Boston Globe doesn't sell the Metro section or the art section or the sports section separately, and they certainly don't sell individual articles separately. Now, there may be economic reasons for that and editorial reasons for that, but there isn't really a distinction. The State's answer to that hypothetical is that, well, those are complete and integrated works, but that just begs the question. They're complete and integrated because the Boston Globe has chosen to present them in that manner. And by the same token, the publisher of an anthology of short stories may present it as a complete and integrated work, but that's a discretionary choice. You could sell those stories individually. Maybe you choose to sell them together because they're all acting on a certain theme, or maybe you just think it's a better business model. But either way, the First Amendment applies. Counsel, as I understand it, the Times, the Post, and perhaps the Globe actually do sell crosswords and recipes by separate subscription, and they are real moneymakers for the newspapers. And I assume you would say that telling them that they can't do it that way also violates the First Amendment. Certainly, Your Honor. And I should be clear that cable operators sell a lot of content individually on an a la carte basis. We sell a lot of movies that we all watch a la carte, a video on demand, and there are sports events that are available pay-per-view. The point simply is that we get to make those choices together with programming providers, cable operators, that the government can't come in and dictate a particular manner of expression any more than it can dictate which programs are carried at all. Are you advocating for, given the way you have described the impact of this law, are you arguing that the district court was wrong to adopt intermediate scrutiny as the relevant analysis? Are you urging us to rule that strict scrutiny applies here? Is that your position? Your Honor, we do think the district court got it wrong and should have recognized that the impact on particular content triggers strict scrutiny, but we have not asked this court to reach that question. It's not necessary to reach because the state does concede that they can't reach any level of scrutiny on this record. And so we have expressly disclaimed any interest in asking this court to decide. Five minutes remaining. Now, I understand that you would like us to address the preemption argument and rule as you do because that ruling is a matter of law, would preclude any need for this to go back for further factual development. But if we don't do that, I mean, I gather you will, and it does go back, you will renew your argument for strict scrutiny. Is that correct? That is correct, Your Honor. At this point, the district judge may view it as law of the case that intermediate scrutiny applies and may not reconsider that. The district judge did recognize that even under intermediate scrutiny, there's a significant burden to show that this law directly advances the asserted governmental interest. And there's zero evidence that it does. And in fact, the only evidence shows that it does the opposite. We've spoken quite a bit about the issue of editorial discretion. I mean, if we were to conclude that there's not only a singling out of the cable operators in the way that implicates the First Amendment, but that this law also affects the editorial discretion, would you take the position that it would follow from that, that you would be entitled to strict scrutiny? I mean, if we were to say, we disagree with the district court, we think that editorial discretion is also implicated here, would it follow from that, that that leads to strict scrutiny in your view? I don't know if it follows automatically, Your Honor. The Turner case, in a closely divided series of decisions, established the principle that editorial discretion was implicated, but nevertheless applied intermediate scrutiny in Turner 1 and Turner 2, and many other cable decisions challenging regulations that found unquestionably speech was implicated, found that intermediate scrutiny applied. Now, some of those cases may have been superseded because the Reid case in the Supreme Court, I think, broadens the conception of what is content-based. But one of the reasons we want this court to reach preemption is, while we think we're right, strict scrutiny should apply, we think we're right that the legislative pre-enactment record was too threadbare to support this law under any level of scrutiny, we don't think we should have to litigate those issues if the court agrees with us that there was clear error on the application of the preemption provision. Counsel, you know, normally we avoid deciding constitutional issues if there's a non-constitutional ground available. But I see a lot of reasons in this case to avoid the preemption question, which I actually think is quite difficult and may in some ways be tied to the First Amendment question. Also, if this is decided on First Amendment grounds, no subsequent FCC administration can, if you will, overrule a court decision on preemption. So there's a certain interest in finality that would argue for just deciding it on First Amendment grounds. And I will point out that counsel, in this case, has primarily argued First Amendment to us. I'm not at all sure it would be wise for us to get into preemption. Do you have a very good argument as to why we should? Well, Your Honor, certainly this court frequently upholds injunctions on other grounds that support affirmance. And here, as Your Honor notes, there is an intertwining, in some sense, between the First Amendment analysis and the preemption analysis. And it would, I think, make sense to, under constitutional avoidance principles, resolve this case without going back below and deciding levels of scrutiny and deciding the sufficiency of a legislative record. Those two are important questions that would have to be joined and wouldn't if the district court, if its error on preemption were corrected. We think it's fundamentally wrong because just as under the First Amendment, they argue there has to be the dictating of particular program carriage or forbidding that carriage, that is an incredibly narrow reading of this preemption provision, which states that requirements regarding the provision or content of cable services are preempted if those go beyond what is prescribed in Title VI of the Act. If I've understood the preemption argument, you are asking us to reach a ground that would put us in conflict with the D.C. Circuit. Whereas on your telling of it, if we were to decide this on First Amendment grounds, we would not be in conflict with the decision of any other circuit. Is that correct? I think that's correct, depending on how you read United Video, Your Honor. That court can be read to say that the governmental measures need to be content-based. And we have argued that, this goes back to Judge Lippis' question about level of scrutiny, we have argued that the measure here is content-based. It does result in the withdrawal of programming that can't be licensed a la carte. And so in that sense, it can be harmonized with United Video because it does go to the content of cable services, not just the programming, to the provision. We think it quite clearly implicates provision as well, and United Video is wrong insofar as it says that provision doesn't have any independent meaning and that only measures that dictate particular programming to be carried implicate Section 544. Well, I'm not sure we should be getting into a textualist versus legislative intent type argument given the state of the law in the Supreme Court on those particular issues at this point in our history. Understood, Your Honor. I would just point out in closing that this Court's precedents, though, do very strongly support our position. Your own opinions in the Massachusetts Delivery Association cases under the FAA Authorization Act, Judge Torwaya's decision in Bauer v. Egypt Air, both held that the text does govern where it's playing, and both devised a test that we think is quite sensible for this case, which is that laws that are, like this one, purposefully expansive preempt where either they expressly reference, in this case, the provision of cable service, or they substantially impact it. We think this case, much more than the wage laws it issued in the Mass Delivery Association cases, and even more than the special duty in the Egypt Air case that would have been imposed, this, again, is aimed very specifically and would quite fundamentally upend the provision of cable services. In that sense, there is no reading of the text that's remotely fair that doesn't encompass this manual. I must admit, counsel, as I hear your argument, I'm not disparaging your argument at all. It's very well stated. It convinces me more and more that we should probably stay away from the preemption issue. I think it's an extremely complex, highly nuanced issue, and frankly, I don't think it's... That has not been the focus of the briefing. I don't think we have, frankly, the briefing in this appeal that is at all adequate to the complexity of that issue. And so I must acknowledge that I share reservations about going that direction as well. I certainly understand that, Your Honor. I guess I would ask as a fallback that if the Court doesn't resolve the question, we would certainly prefer that it recognize that we have presented substantial arguments that merit reconsideration on remand. We don't think the district judge... Counsel, counsel, you were doing pretty well there. Don't go too far. All right. Thank you, Your Honor. Thank you. Attorney Brill, please mute your audio and video. Attorney Taub, you have two-minute rebuttal. Your Honor, I'd like to start sort of where I think Mr. Brill ended up, maybe not ended up, but towards the end of his presentation where he said that this law is going to result in the withdrawal of content because of franchising agreements. And our position is that the current record does not support that. As the district court noted, we don't have these franchise agreements in front of us. So we don't know, for example, whether it says, you know, you must do the following things unless state or federal law provides otherwise. We don't know that. What we also don't know is how these agreements are going to be dealt with in the future if this law goes into effect. So Comcast, in their declaration, they say that they could go back and renegotiate these franchise agreements. And so it's purely speculation at this point as to whether or not this law would have... They also say you would put them in violation of almost every agreement that they have signed, and it would lead to litigation. Isn't that correct? I'd like to understand the import of what you're saying. Are you suggesting that the record that has been made by the cable operators does not support their editorial discretion position? Or are you arguing even more broadly that it doesn't support their singling out position? What is the significance of your reliance on the record, the argument you're making? Yeah, so what I'm addressing here is this issue that this law is going to affect content because it's going to result in the withdrawal of content in Maine. And so our point there is that all the record suggests and all the record supports is that it could have that result. And I don't even think that the plaintiffs in their declarations affirmatively say it is going to result in the withdrawal of content. And to Judge Lynch's point, yes, they say that this will put them in violation of the agreements. But, you know, often compliance with agreements is excused if it would be unlawful to comply. As I heard them, they also said there are a lot of costs of going to people's homes to refit old cable boxes on televisions because they're not capable of doing what the law requires and that they would incur huge expense in order to do that. Are you saying that's irrelevant? It's irrelevant from the First Amendment standpoint unless they're saying that because of those costs it's somehow going to decrease the content that gets to consumers. And they're not saying that. They're just saying that this would be really expensive for us to do. They're not saying that it's going to result in people no longer having access to HDTV or the Comedy Network or something like that. Well, a number of consumers, at least until they get their boxes changed, wouldn't have access. Well, I'm not sure that's right. My reading of the declarations is that those upgrades will be necessary for those consumers who want to start buying content a la carte. I don't read the declarations as saying that we won't even be able to provide the packages anymore. And so, you know, we don't know how many consumers are even going to want to purchase content a la carte. But I don't think, at any rate, I don't think the declarations support the notion that nothing will be available to consumers until all of these boxes get upgraded. And, you know, I recognize this might not be a significant point or it might not be what this case turns on. But just in terms of consumer protection, this is an anti-bundling law at its heart. And I'm going to say this. I know how the court's going to react because I recognize there's a difference to some extent. But if Maine decided that consumers should be allowed to buy one or two eggs at a time at the grocery store and not have to buy a whole dozen of eggs, and so it passed a law requiring that grocery stores sell eggs individually, that would be a classic consumer protection measure. Now, I recognize that that's different because grocery stores are not engaging in First Amendment conduct. But my point is just that is that anti-bundling measures are consumer protection measures. And that's a separate issue from whether they implicate the First Amendment. And the other point I'd like to make is, and this sort of goes to the issue of the Boston Globe. And we used some hypotheticals about a bookstore or a musician with an album. I really think that until the Turner case was decided, it was really an open question whether cable operators are even engaged in First Amendment conduct because they are aggregators. They are simply taking material from a lot of different sources. But counsel, what's the point of that? I mean, that ship sailed long ago. It did. But what I was going to say, Your Honor, is that the Supreme Court said they absolutely are First Amendment actors because they're exercising their discretion in deciding what content they are going to include. But what the court didn't say, and what I think it would be a leap for this court to do, is to say that not only does the First Amendment protect their right to decide what content they're going to distribute, but it also protects their right to require consumers to buy 100 channels when they only want to watch one channel. Mr. Taub, in addition to Judge Lopez's point, you seem to have forgotten that content providers are also plaintiffs in this case and have put on their own declarations. And again, Your Honor, we would say that those declarations don't support the notion that they're somehow going to not be able to get their content to consumers. They can still give it to the cable company. Yes, thank you. You've argued that. Can I hear what he was saying, please? Go ahead, finish. I was just going to say, Your Honor, that the declarations don't demonstrate that there's going to be some interference with the ability of content programmers to get their content to the cable operators. They can still get it to the cable operators, and the cable operators can still package it and sell it to consumers. The only additional point is that it has to be sold individually. And it may well be that there's going to be broader distribution of content because consumers who, for example, didn't want to get ESPN because it would require them to buy 100 other channels are now going to buy that network because they can get it all individually. Then why did so many programmers then put restrictions on a la carte and prohibit the cable companies from doing that? That is the record in this case. And we would say that the record demonstrates this was done purely for economic and business interests. It was done so that you're forcing consumers to buy a lot of stuff that they don't want to get the few things that they want. And so that's what our view of the record is. Now, obviously, the court is free to go back and look at the declarations and may disagree with how I'm characterizing them. But I would say at the end of the day, if you look really carefully at the declarations and sort of avoid just kind of their general statements and look at the specific facts, these bundlings are really just made to maximize revenue. No more, no less. Thank you. That concludes argument in this case.